UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

TERRELL HICKS,

                                   Plaintiff,

              -v-

THE CITY OF NEW YORK; Retired New York City
Police Department ("NYPD") Detective ("DET.")
JOSEPH ROSARIO, Shield No. 3759; DET. BETZAYDA
FRATICELLI; DET. CLAUDE SUMLIN; Former NYPD
DET. UC001; DET. JOHN DOE 1; DET. JOHN DOE 2
(the names "UC001" and "John Doe" being fictitious, as
their true names are currently unknown), in their
individual capacities,

                                   Defendants.

-------------------------------------------------------------------x

**SECOND AMENDED
COMPLAINT AND DEMAND
FOR A JURY TRIAL**

**12-CV-3502 (RWS) (AJP)**

RECEIVED
JUL 0 8 2013
U.S.D.C. S.D. N.Y.
CASHIERS

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the Fourth, Fifth and

   Fourteenth Amendments of the Constitution of the United States, through the Civil Rights

   Act of 1871, as amended, codified as 42 U.S.C. § 1983.

2. Plaintiff TERRELL HICKS' rights were violated when officers of the NEW YORK CITY

   POLICE DEPARTMENT ("NYPD") unconstitutionally detained and arrested plaintiff and

   caused him to be prosecuted despite the absence of probable cause – on two separate

   occasions.

3. Specifically, acting pursuant to established NYPD practice and custom, NYPD Detective

   ("DET.") JOSEPH ROSARIO (Shield No. 3759) of the NYPD's Manhattan North Narcotics

   Bureau knowingly lied to their colleagues that one or both of them observed Mr. HICKS aid

and abet a drug transaction in July of 2009, thereby causing officers to arrest Mr. HICKS and initiate felony narcotics prosecution against him.

4. Days later, the Special Narcotics Prosecutor for New York City presented the case to the Grand Jury. After hearing Mr. HICKS' testimony and the testimony of at least one other member of the NYPD, the Grand Jury returned no true bill, leading to the dismissal of the charge against him in its entirety.

5. Approximately two years later in 2011, Mr. HICKS was again arrested by the detectives from the same command that arrested him in 2009, the NYPD's Manhattan North Narcotics Bureau, near the same bodega where he was arrested in 2009.

6. There, an undercover detective alleged that he bought narcotics from Mr. HICKS.

7. Upon information and belief, the undercover narcotics detective lied to the Grand Jury, stating that Mr. HICKS was involved in a drug transaction, leading the Grand Jury to indict him.

8. About 11 months later – as Mr. HICKS was sitting in jail – the (recently retired) undercover detective told the Assistant District Attorney and a Deputy Bureau chief at the Special Narcotics Prosecutor that he had absolutely no recollection of ever participating in facts leading to Mr. HICKS' arrest, thereby leading the Assistant District Attorney to move to dismiss the case against Mr. HICKS. After 11 months in jail, Mr. HICKS was freed and the charges against him were dismissed in their entirety.

9. By reason of defendants' actions, including their unlawful arrest and malicious prosecution related to the arrests in both 2009 and 2011, Mr. HICKS was deprived of his constitutional rights.

10. Mr. HICKS also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States.

12. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) in that Mr. HICKS' claim arose in the Southern District of New York.

13. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

14. Pursuant to New York State General Municipal Law § 50-e, Mr. HICKS filed a timely Notice of Claim with the New York City Comptroller on or about January 23, 2012, within ninety (90) days of the dismissal of the charges related to the 2011 arrest and accrual of his claim for malicious prosecution.

15. Thus, this Court has supplemental jurisdiction over Mr. HICKS' state law claims against defendants THE CITY OF NEW YORK, DET. BETZAYDA FRATICELLI, DET. CLAUDE SUMLIN, Former DET. UC001, DET. JOHN DOE 1 and DET. JOHN DOE 2 under the laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

16. Mr. HICKS' claims were not adjusted by the New York City Comptroller's Office within the time period set by statute.

## PARTIES

17. Plaintiff TERRELL HICKS is, and was at all times relevant to this action, a resident of the County of New York in the State of New York.

18. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a

police department, which acts as its agent in the area of law enforcement and for which it is

ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a

police force and the employment of police officers as said risks attach to the public

consumers of the services provided by the NYPD.

19. Defendants Retired NYPD DET. JOSEPH ROSARIO, DET. BETZAYDA FRATICELLI,

DET. CLAUDE SUMLIN, Former DET. UC001, DET. JOHN DOE 1, and DET. JOHN

DOE 2 (collectively referred to as the "individual defendants") were at all times relevant

herein, officers, employees and agents of the NYPD.

20. The individual defendants are being sued herein in their individual capacities.

21. Upon information and belief, Retired DET. ROSARIO has retired from the NYPD.

22. Upon information and belief, Retired DET. UC001 has retired from the NYPD.

23. The true name and shield number of defendants Retired DET. UC001, DET. DOE 1, and

DET. DOE 2 are not currently known to Mr. HICKS. However, they were employees or

agents of the NYPD at the times they participated in Mr. HICKS' arrests in 2011.

Accordingly, Retired DET. UC001, DET. DOE 1, and DET. DOE 2 are entitled to

representation in this action by the New York City Law Department ("Law Department")

upon their requests pursuant to New York State General Municipal Law §50-k.

24. The Law Department, then, is hereby put on notice (a) that Mr. HICKS intends to name those

officers as defendants in an amended pleading once their true names become known and (b)

that the Law Department should immediately begin preparing their defenses in this action.

25. At all times relevant herein, the individual defendants were acting under color of state law in

the course and scope of their duties and functions as an agents, servants, employees and

officers of the NYPD, and otherwise performed and engaged in conduct incidental to the

performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

26. The individual defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of Mr. HICKS' rights.

## STATEMENT OF FACTS

### The July 2009 Incidents

27. The events herein complained of occurred primarily on or about July 8, 2009 at about 1:15 a.m. outside the vicinity of 285 St. Nicholas Avenue in the County and State of New York, and thereafter.

28. At approximately the time and place mentioned supra, Mr. HICKS was standing near the bus stop in the vicinity of 285 St. Nicholas Avenue, socializing with neighbors.

29. At no time herein did Mr. HICKS do anything which any reasonable observer would think is a crime.

30. While Mr. HICKS was standing near the bus stop with his neighbors, DET. ROSARIO lied to his colleagues on the NYPD's Narcotics Boro Manhattan North by telling them that they observed Mr. HICKS sell narcotics to at least two third-parties.

31. In fact, Mr. HICKS did not help anyone obtain narcotics and did not commit any other criminal act at any time herein.

32. Based upon DET. ROSARIO's knowing misrepresentations, an NYPD van approached the area near the bus stop, and officers got out and arrested Mr. HICKS.

33. After Mr. HICKS had been placed under arrest, members of the arrest team entered a deli located at 285 St. Nicholas Avenue. Minutes later, the officers left the deli without anyone in their custody.

34. The officers then transported Mr. HICKS to the NYPD's 25th Precinct located at 120 East 119th Street in New York County. Mr. HICKS was thereafter taken to Central Booking.

35. NYPD Det. James Alamia (Shield No. 07074) swore out a criminal court complaint stating DET. ROSARIO observed Mr. HICKS sell crack cocaine to a third party. Accordingly, Mr. HICKS was charged under criminal court Docket 2009NY053747 with one count of criminal sale of a controlled substance in the third degree, New York Penal Law § 220.39(1).

36. At arraignment, bail was set at $12,000 cash. Because he could not afford bail, Mr. HICKS was remanded into custody.

37. On or about July 13, 2009, Mr. HICKS, Det. ROSARIO and Det. Alamia testified before the Grand Jury. After hearing that testimony, the Grand Jury returned no true bill.

38. Mr. HICKS was thereafter released from custody, and the charge against him was dismissed, without condition, on or about July 14, 2009.

39. As a result of this incident, Mr. HICKS was wrongly incarcerated for approximately five days.

40. Upon information and belief, the New York State Department of Parole thereafter revoked Mr. HICKS' parole based upon the wrongful arrest on July 8, 2009.

41. Mr. HICKS was then incarcerated for an additional eleven months in Groveland Correctional Facility, all as a direct result of DET. ROSARIO's violations of his constitutional rights on July 8, 2009.

### The 2011 Incidents

42. As more fully set forth below, Mr. HICKS was arrested and subsequently prosecuted without probable cause and based upon the fabrications of detectives of the NYPD's Narcotics Bureau Manhattan North command. The narcotics detectives worked in concert to initiate and perpetuate Mr. HICKS' prosecution, resulting in at least 11 months of incarceration before the case against him was dismissed.

### The facts and circumstances of Mr. HICKS' arrest and detention

43. The second arrest here at issue occurred in and near a deli located on St. Nicholas Avenue between 124th and 125th Streets in Manhattan on January 20, 2011 at approximately 11:25 p.m. – approximately the same location where he was arrested in 2009 by detectives of the same NYPD Manhattan North Narcotics Bureau.

44. At approximately the time and place above, Mr. HICKS walked towards the deli to get something to eat.

45. Once inside, Mr. HICKS said hello to an acquaintance from the neighborhood, Daemeon Edwards.

46. Mr. HICKS then walked outside.

47. After a few moments, Mr. HICKS walked inside the deli to get his food.

48. Several plainclothes or undercover detectives or officers – namely, Det. FRATICELLI, Det. SUMLIN, Det. UC001, and the DOE detectives – entered the deli.

49. One or more of the detectives grabbed Mr. HICKS and brought him outside the deli.

50. One or more of the detectives then searched Mr. HICKS and seized his cell phone, cash and other items.

51. The detectives did not find any drugs on Mr. HICKS, as he did not possess any drugs.

52. Further, detectives did not recover any pre-recorded buy money from Mr. HICKS, as he did not have any in his possession at any time.

53. The detectives also arrested Daemeon Edwards.

54. The detectives put Mr. HICKS into a van and took him to the NYPD's 25th Precinct station located at 120 East 119th Street.

55. Inside the precinct, male officers performed a cavity search of Mr. HICKS.

56. The officers did not discover any contraband related to the cavity search.

57. In the early morning hours of January 21, 2011, Mr. HICKS was transferred to Manhattan Central Booking.

### The facts and circumstances of Mr. HICKS' charge and bail hearing

58. Mr. HICKS was then brought before the criminal court. There, he was charged with criminal sale of a controlled substance in the third degree, N.Y. Penal Law § 220.39(1).

59. According to the felony complaint, Det. FRATICELLI – based upon information allegedly provided to her and Assistant District Attorney ("ADA") Atalanta Mihas by Det. UC 001 – swore that Mr. HICKS sold crack cocaine to both Det. UC 001 and Daemeon Edwards.

60. The allegations of Det. FRATICELLI and Det. UC 001 are complete fabrications. At no relevant time did Mr. HICKS sell any drugs to anyone related to the above-described incident.

61. Upon information and belief, the charges were also supported by the complete fabrications of Det. SUMLIN who told other detectives and the prosecutor he personally witnessed Mr. HICKS throw pre-recorded buy money on the ground as the detectives moved in to arrest him.

62. Upon information and belief, all of the detectives knew Mr. HICKS had not committed any crime, yet they fabricated a story which they knew to be false and forwarded that false information to a narcotics prosecutor and thereby caused the prosecutor to initiate criminal proceedings against Mr. HICKS.

63. Upon information and belief, all of the detectives knew Mr. HICKS had not committed any crime herein, but, upon information and belief, none of the detectives caused this exculpatory information to be forwarded to Mr. HICKS.

64. The criminal court set bail at $5,000 cash or $10,000 bond.

65. Mr. HICKS could not afford the bail set by the court, and he was subsequently remanded to custody.

## The facts and circumstances of the indictment against Mr. HICKS

66. On or about January 26, 2011, the case against Mr. HICKS was presented to a Manhattan Grand Jury.

67. Upon information and belief, Dets. FRATICELLI, SUMLIN, and/or UC 001 testified before the Grand Jury.

68. Upon information and belief, Dets. FRATICELLI, SUMLIN, and/or UC 001 knowingly lied when they told the Grand Jury that Mr. HICKS sold crack cocaine to Det. UC 001 and/or Daemeon Edwards.

69. Upon information and belief, Det. SUMLIN knowingly lied to the Grand Jury when he told them he personally witnessed Mr. HICKS throw pre-recorded buy money on the ground as the detectives moved in to arrest Mr. HICKS.

70. Upon information and belief, none of the detectives told the Grand Jury the exculpatory facts known to them – namely, the fact that Mr. HICKS did not sell any drugs to Det. UC 001 or

Daemeon Edwards and the fact that Det. SUMLIN did not actually observe Mr. HICKS throw pre-recorded buy money on the ground.

71. Upon information and belief, none of the detective-defendants caused Mr. HICKS or his criminal defense attorney(s) to be told the exculpatory facts known to the detectives – namely, the fact that Mr. HICKS did not sell any drugs to Det. UC 001 or Daemeon Edwards and that Det. SUMLIN did not see Mr. HICKS throw any pre-recorded buy money to the ground.

72. As a result of the detectives' lies and/or intentional omissions, on or about January 26, 2011, the Grand Jury indicted Mr. HICKS for criminal sale of a controlled substance in the third degree, N.Y. Penal Law § 220.39(1).

### The facts and circumstances of the failed prosecution of Mr. HICKS

73. Mr. HICKS remained incarcerated as his criminal case proceeded.

74. On or about October 19, 2011, the prosecutor assigned to the matter served an off-calendar certificate of readiness upon Mr. HICKS' defense attorney and the criminal court, an act which purports to tell the court and defendant that the government and their witnesses are ready for trial.

75. In court on December 5, 2011, the prosecutor announced the government was not ready for trial and requested a two-day adjournment.

76. Two days later, on December 7, 2011, Mr. HICKS was brought to court. Once there, Mr. HICKS was uncuffed and released on his own recognizance.

77. Accordingly, Mr. HICKS was in custody approximately 11 months, from January 20, 2011 until December 7, 2011.

78. In either December of 2011 or January of 2012, ADA Mihas filed and served an affirmation in support of her application to dismiss the indictment against Mr. HICKS.

79. In that affirmation, ADA Mihas stated, <u>inter alia</u>:

> In order to prepare for trial, the People contacted former Undercover C-001. Former Undercover C-001 became increasingly difficult to reach by not returning telephone calls and text messages. In addition, former Undercover C-001 did not show up for scheduled appointments to discuss the case. Only after informing former Undercover C-001 that an investigator from the Office of Special Narcotics would be sent to serve him/her with a subpoena did former Undercover C-001 come to the Office of Special Narcotics to prepare for trial. Former Undercover C-001 met with the Assistant District Attorney assigned to the case and a Deputy Bureau Chief. Former Undercover C-001 informed the People that s/he had spoken to members of the field team and that s/he did not remember the facts of this specific case. After reviewing the paperwork related to this case, including the buy report and the vouchers, and after viewing a photograph of both the defendant and Dameon Edwards, former Undercover C-001 informed the People that s/he did not have an independent recollection of this case and would be unable to testify in sufficient detail to prove the case beyond a reasonable doubt at trial.

80. As a result, on or about January 17, 2012, the indictment against Mr. HICKS was dismissed and the prosecution was terminated.

### FIRST CLAIM
### DEPRIVATION OF RIGHTS
### UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983
### (*Against All Defendants*)

81. Mr. HICKS incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

82. Defendants, under color of state law, subjected Mr. HICKS to the foregoing acts and omissions, thereby depriving Mr. HICKS of his rights, privileges and immunities secured by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights: (a) freedom from

unreasonable seizure of his person; (b) freedom from arrest without probable cause; (c) freedom from false imprisonment; (d) freedom from malicious prosecution by the police; (e) freedom from having police officers fabricate evidence against him in the course of a criminal prosecution, thereby initiating and perpetuating the criminal prosecution while plaintiff remained incarcerated; (f) freedom from having police officers refuse to disclose exculpatory information in the course of the criminal prosecution here at issue; and (g) freedom from deprivation of liberty without due process of law.

83. Defendants' deprivation of Mr. HICKS' constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## *MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

84. Mr. HICKS incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

85. All of the acts and omissions by the individual defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

86. Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual police defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

87. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices,

procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

88. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

    a.  Arresting persons known to be innocent in order to meet "productivity goals" (<u>i.e.</u>, arrest quotas);

    b.  Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

        i.  in order to protect other officers; and/or

        ii.  in order to meet said productivity goals;

    c.  Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

    d.  Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

    e.  Retaliating against officers who report police misconduct; and

    f.  Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

89. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

    a.  <u>People v. Alicea</u>, 00012-2013 (Sup. Ct., N.Y. Co.) (NYPD sergeant indicted for falsely swearing he observed two men engaged in a drug transaction, when video evidence clearly shows that the two arrestees had no contact; in response to the indictment, Manhattan District Attorney Cy Vance stated "We rightfully trust our police officers to report their activities truthfully. Those who do not erode the public's trust in law enforcement… To falsely accuse anyone of a drug sale is not only unacceptable, it is a crime.");

    b.  <u>People v. Arbeedy</u>, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's

practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

c. Schoolcraft v. City of New York, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

d. Long v. City of New York, 09-CV-6099 (AKH) (S.D.N.Y.); People v. Pogan, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and is convicted of falsifying police records);

e. Taylor-Mickens v. City of New York, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

f. Lin v. City of New York, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence);[1]

g. Colon v. City of New York, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious

---

[1]    For a description of this case and settlement, see, Anahad O'Connor, City Pays $98,000 to Critical Mass Cyclists, N.Y. Times, March 30, 2010, available at http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

h. <u>Bryant v. City of New York</u>, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);[2]

i. <u>Williams v. City of New York</u>, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

j. <u>MacNamara v. City of New York</u>, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

k. <u>McMillan v. City of New York</u>, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

l. <u>Avent v. City of New York</u>, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

m. <u>Smith v. City of New York</u>, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

n. <u>Powers v. City of New York</u>, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

o. <u>Allen v. City of New York</u>, 03-CV-2829 (KMW) (GWG) (S.D.N.Y.) (police surround and arrest groups of persons lawfully protesting against the policies of the World Economic Forum; numerous police officers falsely swear that they gave orders to disperse; and, even if they had given such orders, the police provided no place of egress for the protestors to disperse);

p. <u>Nonnemann v. City of New York</u>, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youth);

---

[2]     For a description of this case and ultimate settlement, see, Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

q. <u>Richardson v. City of New York</u>, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

r. <u>Barry v. New York City Police Department</u>, 01-CV-10627 *2 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

s. <u>Taylor v. City of New York</u>, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as <u>Richardson</u>; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

t. <u>White-Ruiz v. City of New York</u>, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

u. <u>Ariza v. City of New York</u>, 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at*14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

90. Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

a. Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[3]

b. An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at." Later in the recording - made during a roll call in 2010 at Transit District 34 in Coney Island - she

---

[3] Jim Hoffer, *NYPD Officer claims pressure to make arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[4]

c.  NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officer to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at a Pizza Hut, this is what you're going to be doing till (sic) then."[5]

d.  The New York Daily News obtained and published two (2) internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[6]

e.  Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[7]

f.  In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As

---

[4]     Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas*, N.Y. Daily News, March 3, 2011, *available at* http://www.nydailynews.com/ny_local/2011/03/03/2011-03-03_nypd_lt_janice_williams_captured_on_tape_pushing_for_more_busts.html.

[5]     *Id.*

[6]     James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010, *available at* http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.

[7]     Tom Namako and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.com/p/news/local/space_hogs_lapped_on_empty_subways_m7iRAd9b4E9alYPuGvy5OO.

one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[8]

g. In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[9]

h. Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[10] Ultimately, the jury in that case ruled that the police had a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest."[11]

i. The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four parking tickets, three moving violation citations, three "quality-of-life" summonses, make one arrest and two stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[12]

j. Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

---

[8]    Rocco Parascandola, *Irate cops at 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, *available at* http://www.nydailynews.com/news/ny_crime/2010/12/12/2010-12-12_bklyn_cops_threaten_tixwriting_boycott.html#ixzz180Q0JW7t.

[9]    Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79th Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15, 2010, *available at* http://www.nydailynews.com/ny_local/2010/12/15/2010-12-15_summons_strike_i_dare_ya__deputy.html.

[10]    William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011, at 6, available on Westlaw at 2011 WLNR 2986205; *see also* Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15, 2011, at 20, also available on Westlaw at 2011 WLNR 2986205.

[11]    Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[12]    *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html (referring to the arbitrator's report).

The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

"You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[13]

91. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, <u>inter alia</u>, by the following:

a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This

---

[13]    Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[14]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[15]

d. Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[16] When it does, however, Police Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[17] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007.

---

[14]  Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[15]  Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[16]  In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%). *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[17]  Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[18]

92. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, <u>inter alia</u>, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them.[19]
>
> [...]
>
> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[20]

b. In June of 2011, in the case in New York County Supreme Court entitled <u>People v. William Eiseman</u> (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case

---

[18]    Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[19]    Mollen Commission Report, p. 36.

[20]    Mollen Commission Report, pp. 40-41.

against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[21]

c.  In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[22] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

> Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[23]

d.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the

---

[21]    Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[22]    Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

[23]    *Id.*

United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[24]

e. In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…
>
> [P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[25]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[26]

---

[24]    John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/ 2008-06-20_claims_of_corruption_at_queens_precinct_.html.

[25]    Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

f.  In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[27] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000. In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[28]

g.  Separate Grand Jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two Grand Jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[29]

93. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, <u>inter alia</u>, by the following:

a.  Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

b.  In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

---

[26]  John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[27]  In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[28]  *Id.*

[29]  David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

     c.  Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

94. The existence of the above-described unlawful <u>de facto</u> policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Kelly.

95. The actions of the individual defendants involved in Mr. HICKS' arrests and prosecutions here at issue resulted from and were taken pursuant to the above-mentioned <u>de facto</u> policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, <u>inter alia</u>, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

96. All of the foregoing acts by defendants deprived Mr. HICKS of his federally protected rights, including, but limited to, the constitutional rights enumerated in paragraphs "82" above.

97. Defendant CITY knew or should have known that the acts alleged herein would deprive Mr. HICKS of his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

98. Defendant CITY is directly liable and responsible for the acts of the individual defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

99. Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

100.    The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to arrest Mr. HICKS without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Mr. HICKS' constitutional rights. Pursuant to the aforementioned CITY

policies, practices and/or customs, other officers failed to intervene in or report other defendants' violation of Mr. HICKS' rights or subsequent perjury.

101.    Mr. HICKS' injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful <u>de facto</u> policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

**THIRD CLAIM**
**MALICIOUS PROSECUTION**
**<u>UNDER THE LAWS OF THE STATE OF NEW YORK</u>**
*(Against All Defendants Except Rosario)*

102.    Mr. HICKS incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

103.    By the actions described above, by making false allegations and forward them to a narcotics prosecutor, and by the false allegations against Mr. HICKS in the accusatory instrument, and to the Grand Jury, and at other points throughout the prosecution, Dets. FRATICELLI, SUMLIN, UC001, DOE 1 and DOE 2 caused a criminal proceeding to be initiated against Mr. HICKS, even though there was no probable cause for an arrest or prosecution in this matter. Dets. FRATICELLI, SUMLIN, UC001, DOE 1 and DOE 2 maliciously caused this prosecution to be initiated in that he knew there was no probable cause for such prosecution. The criminal case against Mr. HICKS was terminated in his favor in that all charges were dismissed in their entirety after the criminal court ruled that his arrest was made without probable cause.

104.    The conduct of Dets. FRATICELLI, SUMLIN, UC001, DOE 1 and DOE 2 alleged herein, occurred while they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as NYPD officers, and/or while they were acting as agents

and employees of defendant CITY, clothed with and/or invoking state power and/or authority, and, as a result, defendant CITY is liable to Mr. HICKS pursuant to the state common law doctrine of <u>respondeat superior</u>.

105.    As a result of the foregoing, Mr. HICKS was deprived of his liberty, endured psychological and emotional injury, humiliation, costs and expenses, and was otherwise damaged and injured.

## JURY DEMAND

106.    Mr. HICKS demands a trial by jury in this action on each and every one of his damage claims.

*WHEREFORE*, plaintiff TERRELL HICKS demands judgment against the defendants individually and jointly and prays for relief as follows:

a.    That he be compensated for violation of his constitutional and common law rights, pain, suffering, mental anguish, and humiliation; and

b.    That he be awarded punitive damages against the individually-named defendants; and

c.    That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.    For such other further and different relief as to the Court may seem just and proper.

Dated:    New York, New York
          July 3, 2013

                              Respectfully submitted,

                    By: _____
                        David B. Rankin
                        Rankin & Taylor, PLLC
                        *Attorneys for the Plaintiff*
                        11 Park Place, Suite 914
                        New York, New York 10007
                        t: 212-226-4507